IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2014 OCT 30 A 10: 18

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

UNITED STATES OF AMERICA )
*ex rel.* Alan Stewart, )
)
Plaintiff, )
) Case No: 2:14-CV-112-CSC
v. )
)
GENTIVA HEALTH SERVICES, INC., )
)
Defendant. )
)
)

**FILED UNDER SEAL**

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

**DEMAND FOR JURY**

## *QUI TAM* COMPLAINT

Relator Alan Stewart, on behalf of himself and the United States of America,

alleges and claims against Defendant Gentiva Health Services, Inc., as follows:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33

(the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28

U.S.C. § 1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a),

because Defendant qualifies to do business in the State of Alabama, transacts

substantial business in the State of Alabama, transacts substantial business in this

judicial district, and can be found here. Additionally, and as described herein,

SCANNED

Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, and *inter alia*, Defendant submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and made or used false records material to have such claims paid.

## PARTIES

3.     Defendant Gentiva Health Services, Inc. ("Gentiva") is the nation's largest provider of home health care, hospice and related services. Gentiva is based in Atlanta, Georgia and has approximately 420 locations in 40 states serving more than 350,000 patients. Gentiva's Home Health division provides direct home nursing and therapy services via more than 270 agencies in 39 states. Gentiva's Hospice division provides care to terminally ill patients via 150 agencies in 29 states. Through his experience at Gentiva, Relator has learned that Defendant conducts its operations with the intent to defraud the United States by submitting claims for hospice care with complete disregard for patient eligibility, Medicare billing requirements, or compliance with other federal healthcare laws and regulations.

4.     Relator Alan Stewart has extensive experience in the health care industry. Alan began his career in 1995 as a registered nurse and has been consistently promoted into management. In 2009, Gentiva hired Mr. Stewart to serve as an Area Director in the home health division. Mr. Stewart was promoted

to Area Vice President in 2012, serving central Alabama and western Georgia. Through his experience as a home health Area Vice President, Mr. Stewart has discovered that Gentiva's new financial plan beginning in or around 2013 is to transition its home health patients to the more profitable Medicare hospice benefit with little to no effort to comply with Medicare conditions of payment or participation and with the intent of routinely billing for patients who are not terminal and therefore not eligible for the Medicare hospice benefit. Mr. Stewart brought his concerns to Jason Owen, Division President of Gentiva Home Health and Hospice, and Christine Perry, Regional Vice President of Clinical; however, his claims were dismissed and his job threatened.

5.     Prior to filing this Complaint, Relator voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relator is the original source of the information for purposes of that Section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in his possession upon which his claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.   Background

6.   Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

7.   Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care.   *See* 42 U.S.C. § 1395d.   A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."   42 C.F.R. § 418.3.   By electing the Medicare hospice benefit, patients waive all rights to curative care and in so doing agree to forego any Medicare coverage for curative treatment. 42 U.S.C. § 1395d; *see also* 48 Fed. Reg. 56008, 56010 (Dec 16, 1983).   A patient may at anytime revoke his or her hospice election and resume Medicare Part A coverage, but throughout the duration of the hospice election, all curative treatment for the terminal illness ceases. *Id.*; 42 C.F.R. § 418.28.

8.   Consequently, Gentiva's scheme is not only a fraud on the Medicare system but also is extremely harmful to patients, because it takes people from its

home health census whom it knows to have a good prognosis and a good rehabilitation potential and coerces them to cease all therapy and curative care simply so that Gentiva can increase its profits from Medicare. Gentiva's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986 ("Hospice"). By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

9.     From such humble, altruistic roots, Hospice has become big business. Medicare Hospice payments rose from $205 million in 1989 to $9.2 billion in 2006, and are estimated to be well over $14 billion at the time of the filing of this

complaint, according to a 2011 report by Bloomberg, "Aunt Midge Not Dying in Hospice Reveals $14 Billion Market." In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Since then, the situation has only gotten much worse: in late 2013, *The Washington Post* issued an investigative report entitled, "Hospice Firms Draining Billions from Medicare," revealing that "over the past decade, the number of 'hospice survivors' in the United States has risen dramatically, in part because hospice companies earn more by recruiting patients who aren't actually dying." *The Washington Post* article drew its conclusions from data collected by hospices in California only, but venture capitalists and other investors all across the country have been quick to perceive that Hospice represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying. Mr. Stewart experienced through his personal first-hand knowledge and observations that Gentiva is among the corporations who are fraudulently using hospice as a profit center by presenting false claims for *per diem* reimbursements for patients that it knew or should have known did not qualify for the Medicare Hospice Benefit – Gentiva's fraud is particularly egregious as it is knowingly taking patients from its

home health census who are positively responding to therapy and who are curable and transitioning them to Gentiva's hospice census, where patients are forced to forego all curative care. In some cases, as noted below, Gentiva uses a physician's order for Gentiva home health and surreptitiously gives it to Gentiva's marketers who are incentivized to coerce patients and caregivers to accept hospice instead.

## II.   Hospice Benefits, Reimbursements, and Requirements

10.   Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22. Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.   Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

11.   Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302. Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are

provided. Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

12.     In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services. *See* 42 C.F.R. § 418.202. The hospice must design a plan of care (POC) inclusive of all covered services necessary to meet the patient's needs. *See* 42 C.F.R. § 418.56. That POC must be in place prior to the hospice submitting a Medicare bill.

13.     Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the "Aggregate Cap"). The Aggregate Cap is set by CMS according to federal regulations, and in 2012 stood at $25,377.01 per patient. The Aggregate Cap is not related to expenditures on individual patients. Rather, it limits the aggregate reimbursement a provider may receive from Medicare. A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year.     Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate Cap amount by $25,377.01.

14.     Medicare will not pay for hospice services provided to patients who are not terminally ill. *See* 42 U.S.C. §1395y. The hospice medical director and the

patient's attending physician must certify that the patient is terminal prior to the patient's admission to hospice in accordance with 42 C.F.R. 418.22 (b). *See* 42 C.F.R. § 418.20; 78 Fed. Reg. 48234, 48245 (Aug. 7, 2013) ("[C]ertifications and recertifications of hospice eligibility are statutory requirements for coverage and payment. The content of the certifications and recertifications must conform to the . . . requirements at [42 C.F.R.] § 418.22(b)"). Section 418.22 (b) requires that the hospice's medical record contain, in addition to written physician certifications of terminal illness, "[c]linical information and other documentation that support the medical prognosis" of a life expectancy of six months or less if the illness runs its normal course. 42 C.F.R. § 418.22(b). The Centers for Medicare and Medicaid Services (CMS) has instructed hospice providers that clinical information and other documentation must accompany and support the physician certifications in the medical record. *See* 78 Fed. Reg. 48234-01, 48245 (Aug. 7, 2013) (for a certification to satisfy 42 C.F.R. § 418.22(b), "Clinical information and other documentation that support the medical prognosis must be in the medical record with the written certification"); 75 Fed. Reg. 70372-01, 70446 (Nov. 17, 2010) (a signed physician certification "is accompanied by clinical information or other documentation supporting the diagnosis"); 74 Fed. Reg. 39384-01, 39398 (Aug. 6, 2009) ("The medical record must include documentation that supports the terminal prognosis."); 70 Fed. Reg. 70532-01, 70534-5 (Nov. 22, 2005) ("A hospice needs

to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of 6 months or less if the illness runs its normal course. A signed certification, absent a medically sound basis that supports the clinical judgment is not sufficient for application of the hospice benefit under Medicare."). Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

15.     Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services. *See* 42 U.S.C. 1395ff. Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on Hospice coverage. *See, e.g.,* LCDs Published by Palmetto GBA. Medicare will not pay for hospice care provided to a patient who does not meet LCDs. *See* 42 U.S.C. 1395y.

16.     To enroll as a Medicare provider, Gentiva was required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form

855A.  In submitting Form 855A, Gentiva made the following "Certification

Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and
> program instructions that apply to this provider. The
> Medicare laws, regulations, and program instructions are
> available through the Medicare contractor. I understand
> that payment of a claim by Medicare is conditioned upon
> the claim and the underlying transaction complying with
> such laws, regulations, and program instructions
> (including, but not limited to, the Federal Anti-Kickback
> statute and the Stark law), and on the provider's
> compliance with all applicable conditions of participation
> in Medicare.

Form CMS-855A.

17.    Gentiva then billed Medicare by submitting a claim form (CMS Form

1450) to the FI responsible for administering Medicare hospice claims on behalf of

the United States.  *See* CMS Form 1450.  Each time it submitted a claim to the

United States through the FI, Gentiva certified that the claim was true, correct, and

complete, and complied with all Medicare laws and regulations.

## DEFENDANT'S FRAUDULENT SCHEMES

18.    From at least October 2013 to the present, the Defendant has

defrauded the United States through the submission, or causing the submission of

false or fraudulent claims to Medicare for ineligible hospice patients and/or by

their failure to report past overpayments for ineligible patients and to reimburse

Medicare for these overpayments.

19.     As a result of the Defendant's submission of, or causing the submission of claims that were knowingly false, or with reckless disregard or deliberate ignorance of their falsity, and/or their "knowing" concealment or avoidance of their obligation to the Government, the United States was damaged by reimbursing the Defendant for providing hospice care to patients that were not eligible for the hospice benefit and by the omission of reimbursement from the Defendant.

20.     Defendant acted with intentional disregard, reckless disregard, or deliberate ignorance to the statements of staff as well as their own records regarding the presence within Gentiva's hospice census of ineligible patients.

21.     As a result, Medicare paid the Defendant monies that should not have been paid and the Defendant retained payments that should have been reimbursed to Medicare.

### Defendant Bills Medicare for Ineligible Hospice Patients

22.     The Defendant systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its hospice division.

23.     Defendant actively recruits, certifies, and bills the United States through CMS for ineligible patients.    Defendant perpetrates its scheme by systematically funneling its home health patients into its hospice division regardless of whether the patient is eligible for the hospice benefit.

24.     Specifically, on August 14, 2014, Gentiva implemented the Cross Continuum Collaboration ("C3") program.  Under the C3 program, all Gentiva home health patients are entered into a database where patients are "flagged" as potential hospice patients, using misleading criteria much broader than the Medicare hospice benefit requirement of a life expectancy of six months or less and without reference to or regard for the local coverage determinations set by the FI who pays Gentiva's claims to Medicare.  Examples of Gentiva's hospice "flags" are advanced age, inability to bathe oneself, inability to ambulate, incontinence of urine, and shortness of breath.  Many of these "flags" are wholly unrelated to the requirements for hospice care.  Once the patients are flagged, the information is provided to Gentiva sales staff in the form of a Strategic Health Plan ("SHP") report.  Sales staff have direct access to the report. Gentiva's Hospice and Home Health Division President Jason Owen admitted to Mr. Stewart that hospice sales staff initially had direct access to home health SHP reports as well as all home health patient information through the Gentiva's home health database but he informed Mr. Stewart that sales staff no longer have direct access to the report. Relator knows, however, that sales staff continue to have direct access to the database and the SHP reports, because as of the date of this filing he was able to track the sales staff who accessed the home health computer database.  Regardless, Christine Perry, Regional Vice President of Clinical, told Mr. Stewart that he and

his home health branch directors must print out the SHP report and physically deliver a copy to sales staff, so that they could continue to improperly access Gentiva's home health patients' records without such access being detected and without the physician's knowledge. Sales staff then directly contact all home health patients that have been flagged, thus bypassing the patient's primary physician, and try to talk the patient or the patient's caregiver into choosing hospice care by offering to pay for the patient's medications and supplies and offering personal care aides. Only after the patient has elected hospice care in response to these predatory sales tactics, does Gentiva finally contact the patient's primary physician for a referral, misleading the physician into thinking that contact with the patient has not yet been made. If the physician does not agree to refer the patient to hospice, Gentiva's medical directors routinely sign the certification of terminal illness anyway. If the patient or caregiver refuses to elect hospice care, Gentiva places the patient on a list and "cold calls" the patient weekly, urging the patient to reconsider.

25. Since the implementation of the C3 program, Mr. Stewart has noticed a dramatic increase in the number of Gentiva home health patients transitioning to Gentiva hospice services in his area. Based on his concern about this process and after receiving numerous complaints from his home health branch directors and from patients and their families, Mr. Stewart and his staff conducted an internal

audit of 144 home health patient charts that had transitioned from Gentiva home health within 0-7 days directly to Gentiva hospice in his area since January 2014. *See* Exhibit A. This audit demonstrated that Gentiva's own home health records showed that more than half of the patients successfully transitioned from Gentiva's home health service to the more profitable hospice service were not terminal and thus were ineligible for the Medicare Hospice Benefit. Gentiva's own medical records described the patients as non-terminal, noting:

- 81 of the 144 (56%) patients had a "good or fair prognosis"
- 74 of the 81 had "good or fair rehabilitation potential"
- 67 of the 74 had their "pain managed or had no pain at all"
- 25 of the 67 had "no de-escalation in their condition" at the time they were transitioned to hospice through Gentiva's C3 program.

As a result of this audit, Mr. Stewart learned that 56% of Gentiva home health patients transitioning to Gentiva hospice are ineligible for the hospice benefit, having a "good or fair prognosis" according to Gentiva's own health records – not a "prognosis such that his or her life expectancy is six months or less if the disease runs its normal course." 42 C.F.R. § 418.3. Mr. Stewart was especially disturbed to learn that patients with good rehabilitation potential were being coerced into electing hospice and foregoing the curative treatment they deserved.

26.     Defendant is aware, or should have been aware, of the admission to hospice of ineligible patients.

27.     On August 28, 2014, Mr. Stewart emailed Jason Owen, Division President Home Health and Hospice, regarding his concerns about the inappropriate C3 process and ineligible hospice patients. Mr. Stewart reported that on April 17, 2014, Shasta Moore, a Gentiva home health branch director in Enterprise, Alabama, informed him that she received a call from Dr. Reynolds, a local physician. Dr. Reynolds stated that his patient, Patient C.C., would have been appropriate for Gentiva home health; however, after he received a call from Gentiva hospice requesting an order for hospice following an unauthorized evaluation, he felt that that Patient C.C. would be better served by a different home health company. When Ms. Moore spoke to Kay Clemmons, Area Director of Sales ("ADS"), to find out how this happened, Ms. Clemmons told her that the push was for hospice and that it was best for Gentiva for Patient C.C. to be on hospice, as the hospice division was way behind in their admission budget, despite the fact that the patient's physician had ordered home health. Next, Mr. Stewart reported that on July 15, 2014, Alease Merrell, Gentiva Area Vice President of Sales, informed him that she, all clinical sales peoples, and ADSs had access to patient information to run referral and admission reports. Mr. Stewart felt that it was inappropriate for sales staff to have access to patient information. Next, Mr.

Stewart stated that on August 7, 2014, he received a report from Belinda Lee, a Gentiva home health branch director in Hoover, Alabama, informing him that many of her home health patients who were making progress under their current home health plans of care, and therefore treatable, were being admitted to hospice without her knowledge and no longer getting the treatment for their curable conditions. Ms. Lee spoke to Amanda Long, executive director of the local Gentiva hospice agency, hoping to find out how those patients were referred to hospice. Ms. Long did not elaborate on how the patients were referred but agreed to notify home health in the future before admitting home health patients. Lastly, Mr. Stewart informed Mr. Owen that he had received a report from Sherry Ingram, Gentiva home health branch director in Sylacauga, Alabama, stating that Patient H.D. was referred to home health by his primary physician. Additionally, Patient H.D.'s family requested home health restorative treatment. Patient H.D. was admitted to Gentiva home health and a LPTA reported to Ms. Ingram that Patient H.D. was making appropriate progress. However, when the home health occupational therapist arrived to Patient H.D.'s home to perform an evaluation only a few days later, the therapist discovered a Gentiva hospice nurse performing a hospice admission on Patient H.D. It is Mr. Stewart's understanding that Patient H.D. has been admitted to hospice services as the result of coercive tactics by the sales team and hospice staff, without his treating physician's full knowledge of the

restorative potential and current progress being made by home care, and despite having a curable condition and being non-terminal and thus ineligible for the hospice benefit.

28. After receiving the above-mentioned email, Mr. Owen asked Mr. Stewart to come to Atlanta for a meeting. On September 10, 2014, Mr. Stewart met with Mr. Owen, Christine Perry, and David Milton to discuss his findings. Mr. Owen admitted that of the five patients Mr. Stewart initially presented in the meeting, three were very questionable, one being clearly inappropriate for hospice services. Mr. Stewart informed them that there were many other instances like this. Mr. Owen stopped Mr. Stewart and told him that hospice "is the most profitable line of business that Gentiva has and that home health is the pool of patients that we draw from." Mr. Owen emphatically and unapologetically stated that he "did not care how patients get into hospice as long as they get there." He continued by telling Mr. Stewart that he would protect the company's shareholders and their return on investment at all costs. Mr. Stewart asked if Mr. Owen had reviewed the other potential ineligible hospice patients. Mr. Owen shoved the examples at Mr. Stewart without looking at them and then asked if Mr. Stewart could "get on board" and move forward with the company. He ended by telling Mr. Stewart that if he received another complaint, it would "mean your job." Mr.

Stewart understood this to mean that if Mr. Owen received any other complaint from any other individual that he would lose his position as Area Vice President.

29.    The following patient is an example of the Defendant's inappropriate conduct attempting to admit a patient to hospice that was ineligible:

30.    Patient N.P. was referred to Gentiva home health by her primary care physician, Dr. Xiaosi Han, for physical therapy, occupational therapy and a home health aide.   Instead, Gentiva hospice approached the patient without consulting Dr. Han and without sending out a home health clinician in direct contrast to Dr. Han's orders.    When Patient N.P. refused hospice services, Gentiva hospice reluctantly sent a referral to Gentiva home health for admission and put Patient N.P. into Gentiva's C3 program with the intent of ultimately transitioning the patient to Gentiva's hospice service.

31.    By and through all of the circumstances described, *supra*, Defendant has violated the healthcare laws and regulations of the United States, undermined the noble intention and mission of Hospice, defrauded the United States of America, and jeopardized the already strained Medicare program.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS
## UNDER 31 U.S.C. § 3729

32.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

33.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)     Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b)     Defendant submitted false claims for Hospice care provided to patients who were not properly assessed by an RN and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c)     Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

34.     The United States paid the false claims described herein and summarized in paragraph 33(a)-(c).

35.     Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and

re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

36.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**COUNT TWO**
**MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL**
**TO A FALSE CLAIM UNDER 31 U.S.C. § 3729**

37.     Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

38.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)    Defendant created and used false certifications of terminal illness; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)    Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs.

39.    The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

40.    In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

41.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

42. Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

43. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit: Defendant knew that it had received Hospice *per diem* payments for patients who did not qualify for Hospice, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

44.     As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

45.     Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

46.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

47.     The United States paid Defendant for such false claims.

48. Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

49. Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

50. Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

Date: October 30, 2014

James M. Motes

JAMES F. BARGER JR.
J. ELLIOTT WALTHALL
CARRIE M. MOTES

**Attorneys for Relator Alan Stewart**

**OF COUNSEL:**
FROHSIN & BARGER, LLC
3430 Independence Drive, Suite 40
Birmingham, Alabama 35209
Tel:   205.933.4006

## RELATOR DEMANDS A TRIAL BY STRUCK JURY

## CERTIFICATE OF SERVICE

On this the 30th day of October, 2014, Relator hereby certify that in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Certified Mail to:**

United States Attorney George Beck
Attn: AUSA Bob Anderson
131 Clayton Street
Montgomery, Alabama 36104


Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*Janie M. Motes*
OF COUNSEL